DANIEL J. FOLEY, Indiv., *et al.*, Plaintiffs-Appellees, v. PEGGY FLETCHER *et al.*, Defendants-Appellants (Ingalls Health Ventures, Defendant).

First District (1st Division)   No. 1—04—0506

Opinion filed September 19, 2005.

Anderson, Bennett & Partners, L.L.P., of Chicago (Marilee Clausing, Anne Scrivner Kuban, and Diane I. Jennings, of counsel), for appellants.

Nicholas J. Motherway and John M. Saletta, both of Motherway & Napleton, of Chicago, and Lynn D. Dowd, of Naperville, for appellees.

PRESIDING JUSTICE CAHILL delivered the opinion of the court:

This is an appeal from a jury's general verdict in a medical malpractice action in favor of plaintiffs, Daniel and Kathryn Foley (Mr. and Mrs. Foley) and their seven-year-old daughter Hannah, and against defendants, Peggy Fletcher, M.D. (Dr. Fletcher), and Primary Healthcare Associates, S.C. The jury's verdict in favor of defendant Ingalls Health Ventures is not at issue.

Defendants allege that the trial court erred in: (1) allowing plaintiffs to present undisclosed expert testimony in violation of Supreme Court Rule 213 (210 Ill. 2d R. 213); (2) failing to inform the jury that Dr. Fletcher had multiple sclerosis (MS) and related cognitive deficits; (3) barring a videotape from being shown during *voir dire*, depicting a "day-in-the-life" of Hannah, who has cerebral palsy; and (4) enabling the jury to reach a $1 million verdict for an "increased risk of future injury." We affirm the general verdict but vacate the award of $1 million for Hannah's increased risk of future injury.

Hannah was born on March 17, 1998. Plaintiffs filed their complaint in 1999, alleging defendants were negligent in attempting a vaginal birth after caesarian section (VBAC). Plaintiffs claimed defendants knew that Mrs. Foley had two earlier caesarian deliveries, had been advised against future VBAC attempts, and that a VBAC attempt would create substantially increased and avoidable risks to Mrs. Foley and her fetus. Plaintiffs alleged defendants were negligent in allowing induced labor to continue without significant progression despite Mrs. Foley's medical history. Plaintiffs alleged Dr. Fletcher, who was Mrs. Foley's physician, knew or should have known that extended labor was likely to injure Mrs. Foley or her fetus or both.

At a pretrial hearing, defense counsel asked the trial court to find Dr. Fletcher incompetent to testify due to physical and cognitive complications from MS. At an evidentiary hearing, Dr. Fletcher's physician said Dr. Fletcher was diagnosed with a progressive form of MS in February 2001. Other physicians and Dr. Fletcher's sister also testified to Dr. Fletcher's condition. The trial court declined to find Dr. Fletcher

incompetent to testify, citing *Clark v. Otis Elevator Co.*, 274 Ill. App. 3d 253, 257, 653 N.E.2d 771 (1995) (a person is presumed competent to testify unless the party opposing her testimony proves her incompetent). Defense counsel objected, but the parties later agreed that Dr. Fletcher's testimony would be read to the jury from a written evidence deposition. Defendants moved to show during *voir dire* a videotape of Hannah to ascertain whether prospective jurors had bias, prejudice or partiality in favor of a child with cerebral palsy. The trial court denied the motion.

Plaintiffs filed pretrial disclosures on their lay and expert witnesses in compliance with Supreme Court Rule 213 (210 Ill. 2d R. 213). Plaintiffs named Jeffrey L. Wener, M.D., as a "controlled expert witness." See 210 Ill. 2d R. 213(f)(3) (the party presenting the controlled expert witness must identify, among other things, the conclusions and opinions to which the expert will testify). The disclosures listed nine specific opinions of Dr. Wener, the second of which was:

"2. It was a deviation from accepted standards of care for Dr. *** Fletcher to fail to document in prenatal records warnings she allegedly gave of the risk of VBAC delivery to Kathryn Foley. The absence of warnings in the prenatal office records or pre-birth hospital records require[s] the conclusion that the warnings referred to in Dr. Fletcher's operative report, including alleged warnings regarding uterine rupture, were, in fact, not given prior to the uterine rupture experienced by Mrs. Foley, which is likewise a deviation from accepted standards of care."

In Dr. Wener's discovery deposition, he testified in part:

"Q. *** One of the opinions that you have offered in this case *** is that it is a deviation from accepted standards of care for Dr. Fletcher to fail to document in the prenatal record warnings that she gave Mrs. Foley about the risk of VBAC; is that correct?

A. Yes.

Q. You reviewed Dr. Fletcher's testimony that she did in fact discuss the potential risks and complications of a VBAC with Mrs. Foley during the prenatal period, correct?

A. Yes.

Q. If she in fact did so, her action in that regard would comply with the standard of care, correct?

A. Yes.

Q. *** Did you help draft the opinions that are articulated in [the Rule 213 disclosure]?

A. I did not write them but I probably helped draft them, yes.

* * *

Q. [The second sentence of No. 2 of the disclosure] says, [t]he absence of warnings in the prenatal office records or prebirth hospital records require[s] the conclusion that the warnings referred to in Dr. Fletcher's operative report[,] including alleged warnings regarding uterine rupture[,] were in fact not given prior to the uterine rupture experienced by Mrs. Foley which is likewise[,] you believe[,] a deviation from the standard of care.

What causes you to reach the conclusion that the lack of documentation means it didn't happen?

A. *** [W]e are as physicians taught to document what we tell our patients and certainly in evaluating a record for quality purposes or for evaluating a record to determine a breach of the standard of care, you have to rely on what's written in the record.

Q. Okay. Well, Dr. Fletcher does have written in her operative report that her informed consent discussion with Mrs. Foley did take place during the prenatal period, correct?

A. Right."

At trial, plaintiffs called Dr. Wener, who testified, in relevant part:

"[MR. MOTHERWAY (Plaintiffs' attorney)]: And would you explain to the Jury what [informed consent of the patient] means?

[DR. WENER]: Basically, it's the obligation of the physician to sit down face-to-face with his or her patient and explain to them what the risks are in what they're undertaking, whether it's a vaginal delivery, whether it's a surgical procedure. If there are risks, they need to be explained to the patient. The patient needs to know why she's at risk, what in her history or examination puts her at risk, and if the situation changes with time, any additional risks need to be explained to the patient.

MS. CLAUSING [(Defendants' attorney)]: Objection, your Honor. Supreme Court Rule 213. Motion to strike.

THE COURT: We'll have a sidebar.

(Whereupon a sidebar discussion was had out of the presence and hearing of the Jury as follows:)

* * *

MS. CLAUSING: Why the patient is at risk, what puts her at risk, and if the situation changes over time, she should be advised; none of this was disclosed. In the 213s—

THE COURT: Well, it was disclosed. How can this witness give an opinion under 213 and in his discovery [deposition] and not talk vis-a-vis informed consent and not talk about what he just said?

* * *

THE COURT: What did the witness say in his discovery deposition vis-a-vis informed consent?

* * *

MR. MOTHERWAY: Among other things, that this witness would

say Dr. Fletcher was required to give specific risk warnings and failed to do so.

\*\*\*

That's what he's saying now.

\*\*\*

MS. CLAUSING: \*\*\* We discussed this at the deposition \*\*\* and Dr. Wener had reviewed Dr. Fletcher's deposition testimony. In her deposition testimony, she made it clear that she had discussed the risk of rupture, the damage that it could potentially cause to the baby neurologically and death, the problems that [it] could cause to the mother in terms of death, bleeding as a possibility, and I think infection—.

THE COURT: You may bring this out by way of Cross-Examination.

MS. CLAUSING: But now he is adding a new and heightened standard of care with regard to these kinds of items never before disclosed by this gentleman as opinions that these items needed to be included in it.

\*\*\*

MR. MOTHERWAY: His Rule 213 answer is what I read. \*\*\* Dr. Fletcher was required to give specific risk warnings and failed to do so."

The trial judge ruled that Dr. Wener's testimony about Dr. Fletcher's obligation to explain specific risks to Mrs. Foley as the situation changed over time was a necessary corollary to Dr. Werner's earlier statements in his deposition and disclosures. The trial court denied defense counsel's motion to strike.

Dr. Wener also testified that meconium, a sign of fetal distress, was present during the attempted delivery and that the principles of informed consent would require a physician to convey that information to the patient. He said Mrs. Foley's 42 weeks' gestation was a contraindication for a VBAC, a fact which should have been conveyed to her under informed-consent standards. He also testified that when Dr. Fletcher noticed blood in Mrs. Foley's urine, a factor that would raise a concern about uterine rupture, Dr. Fletcher was obligated under informed-consent standards to inform Mrs. Foley.

Plaintiffs also presented the testimony of Dr. Lisa Thornton and Dr. David Townsend, over defendants' objections, to show that Hannah had an increased future risk of scoliosis and hip dislocation. Dr. Townsend said he could not quantify the risk as slight, moderate or significant or predict whether the risk would materialize in Hannah's case.

At the beginning of the trial and again at the conclusion of the evidence, the trial court admonished the jury to give the read testimony of Dr. Fletcher and the videotaped testimony of Dr.

Townsend "the same consideration you would give it had the witnesses personally appeared in court." The trial court did not mention that Dr. Fletcher had MS or cognitive deficits.

The trial court instructed the jury, over defendants' objection, on damages for risk of future injury:

> "The plaintiff Hannah Foley claims that she has suffered an increased risk of scoliosis and hip dislocation as a result of the defendant's negligence. Hannah Foley is entitled to recover damages for physical harm resulting from a failure to exercise reasonable care. If the failure to exercise reasonable care increases the risk that such harm will occur in the future, Hannah Foley is entitled to compensation for that increased risk. In order to award this element of damage, you must find a breach of duty that was a substantial factor in causing a present injury which has resulted in an increased risk of future harm. The increased risk must have a basis in the evidence. Your verdict must not be based on speculation. The plaintiff is entitled to compensation to the extent that the future harm is likely to occur as measured by multiplying the total compensation to which the plaintiff would be entitled if the harm in question were certain to occur by the proven probability that the harm in question will in fact occur."

The trial court also instructed the jury, over defendants' objection, on four possible theories of negligence:

> "The plaintiffs *** claim that they were injured and sustained damage, and that defendants were negligent in one or more of the following respects:
>
> a. Failed to properly manage Kathryn Foley's labor and delivery;
>
> b. Offered Kathryn Foley the option of a VBAC delivery;
>
> c. Failed to fully inform Kathryn Foley of the risks of a uterine rupture with a VBAC delivery; or
>
> d. Failed to inform Kathryn Foley, while she was in labor, of the potential warning signs of uterine rupture and/or fetal distress."

Defense counsel objected to theory "d," arguing that the instruction presented a new theory of liability based on Dr. Wener's undisclosed testimony that additional risks must be explained to a patient as the situation changes over time. The trial court overruled the objection and instructed the jury on theory "d."

Neither side requested a special interrogatory from the general verdict under section 2—1108 of the Code of Civil Procedure (Code) (735 ILCS 5/2—1108 (West 2002)) ("[t]he jury may be required by the court, and must be required on request of any party, to find specially upon any material question or questions of fact submitted to the jury in writing").

The jury returned a $16 million verdict in favor of the Foleys: $2.5

million for disfigurement, $5 million for loss of normal life, $2.5 million for pain and suffering, $5 million for present cash value of earnings, medical care and caretaking, and $1 million for increased risk of future injury.

Defendants appeal. We have taken with the case defendants' motion to cite additional authority. Defendants submitted a verdict form recently drafted by the Supreme Court Committee on Jury Instructions in Civil Cases. The form includes formulae for calculating increased-risk-of-future-injury awards. Because we vacate the award of damages for increased risk of future injury, we find the authority without relevance to our present review and deny defendants' motion.

Defendants' first claim of error is that the trial court improperly admitted testimony of Dr. Wener that had not been disclosed under Rule 213. Defendants argue that the trial court erred in admitting Dr. Wener's statements as "necessary corollaries" of previously disclosed opinions. They contend that his Rule 213 disclosures referred to the standard of care for informed consent on the *general* risks of VBAC that all patients face, but his statements at trial exceeded the disclosures when he said, "if the situation changes with time, any additional risks need to be explained to the patient." Defendants also object to the admission of Dr. Wener's testimony that Dr. Fletcher should have disclosed to Mrs. Foley that her 42-week gestation was a contraindication for VBAC, and that the presence of blood in the urine and meconium were reasons for concern. Defendants argue those newly disclosed opinions were used to present the principle of informed consent as a "central theme" of plaintiffs' case and violated Rule 213, which requires strict compliance under *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109, 806 N.E.2d 645 (2004). Defendants contend that the trial court should not have permitted plaintiffs to "ignore the plain language of Rule 213 and supplement Dr. Wener's opinions in the midst of the trial with opinions positing an on-going duty to repeatedly update the consent during the course of treatment."

The decision to admit evidence rests solely within the discretion of the trial court and will not be disturbed absent an abuse of discretion. *Snelson v. Kamm*, 204 Ill. 2d 1, 33, 787 N.E.2d 796 (2003). A trial court abuses its discretion when "no reasonable person would take the view adopted by the trial court." *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 177, 797 N.E.2d 687 (2003).

■ The purpose of discovery rules, governing the "timely disclosure of expert witnesses, their opinions, and the bases for those opinions[,] is to avoid surprise and to discourage strategic gamesmanship." *Thomas v. Johnson Controls, Inc.*, 344 Ill. App. 3d 1026, 1032, 801 N.E.2d 90 (2003). Supreme Court Rule 213 disclosures are mandatory and

strict compliance is required. *Sullivan*, 209 Ill. 2d at 109. Rule 213(f)(3) requires parties to furnish, among other things, the subject matter, conclusions and opinions of controlled expert witnesses who will testify at trial. 210 Ill. 2d R. 213(f)(3). Rule 213(g) limits expert opinions at trial to "[t]he information disclosed in answer to a Rule 213(f) interrogatory, or at deposition." 210 Ill. 2d R. 213(g). A witness may elaborate on a disclosed opinion as long as the testimony states logical corollaries to the opinion, rather than new reasons for it. *Barton v. Chicago & North Western Transportation Co.*, 325 Ill. App. 3d 1005, 1039, 757 N.E.2d 533 (2001). The testimony at trial must be encompassed by the original opinion. *Prairie v. Snow Valley Health Resources, Inc.*, 324 Ill. App. 3d 568, 576, 755 N.E.2d 1021 (2001). A party's Rule 213 disclosures must "drop down to specifics." *Sullivan*, 209 Ill. 2d at 109. While it is improper for a trial court to allow previously undisclosed opinions that advance a new negligence theory (*Clayton v. County of Cook*, 346 Ill. App. 3d 367, 805 N.E.2d 222 (2003)), testimony is not a new opinion merely because it refers to a more precise time than appeared in the expert's Rule 213 disclosure (*Seef v. Ingalls Memorial Hospital*, 311 Ill. App. 3d 7, 23, 724 N.E.2d 115 (1999)).

▪ Here, the trial court did not abuse its discretion in admitting Dr. Wener's testimony that a standard of care to give specific risk warnings was owed to Mrs. Foley as the "situation" in her attempted VBAC was changing "with time." Plaintiffs in their Rule 213 answers disclosed Dr. Wener's opinion that "alleged warnings regarding uterine rupture, were, in fact, not given prior to the uterine rupture experienced by Mrs. Foley." In both his Rule 213 answers and deposition, Dr. Wener said Dr. Fletcher had not noted in "pre-birth hospital records" or "operative records" that she gave warnings. These disclosures show that Dr. Wener could have been expected to testify to the need for warnings during the course of the attempted VBAC. There is nothing in Dr. Wener's discovery deposition or Rule 213 disclosures to suggest that his opinion about warnings applied only *before* and not *during* Mrs. Foley's attempt to deliver vaginally.

Defendants rely on *Sullivan*, *Clayton* and *Thomas* to argue that strict compliance with Rule 213 is required and, because Dr. Wener's opinions were not in strict compliance, they should have been barred. In *Sullivan*, a medical malpractice case, the plaintiff's expert testified to his undisclosed opinion that a nurse failed to communicate the patient's condition to the primary care physician. The trial court struck the expert's testimony as a discovery sanction under Rule 213. *Sullivan*, 209 Ill. 2d at 106. The supreme court determined the trial

court did not abuse its discretion in striking the testimony because Rule 213 requires strict compliance. *Sullivan*, 209 Ill. 2d at 110-11.

In *Clayton*, the plaintiff's medical malpractice case depended on the explanation of why the defendant's doctors at Cook County Hospital improperly intubated the plaintiff's daughter, who later died. In testimony at trial, the plaintiff's expert said that an endotracheal tube was inserted "without supervision, in the wrong place, by people who were inexperienced." *Clayton*, 346 Ill. App. 3d at 373. The expert's opinion about inadequate supervision had not been disclosed under Rule 213(g). *Clayton*, 346 Ill. App. 3d at 374. The expert conceded that his opinion about lack of supervision was both a factor in the case and a new opinion but claimed inadequate supervision did not play a *large* role in the patient's death. The appellate court found that the trial court erred in admitting the undisclosed opinions and the error warranted reversal. *Clayton*, 346 Ill. App. 3d at 382.

In *Thomas*, a slip-and-fall case, the defendant elicited expert testimony that X rays of the plaintiff's injured knee showed a preexisting degenerative condition. The X rays initially were barred by the order of the motion judge and were not disclosed under Rule 213. *Thomas*, 344 Ill. App. 3d at 1031. Twelve days before the trial, the X rays were disclosed and the judge allowed the defendant's expert to testify about them. This court reversed and remanded, finding that the trial court erred in admitting the undisclosed X-ray evidence, which was relevant to causation and damages. *Thomas*, 344 Ill. App. 3d at 1032.

In *Sullivan* and *Clayton*, a new theory of negligence was added through undisclosed testimony. In *Clayton*, the new theory was negligent supervision; in *Sullivan*, the new theory was a nurse's negligent failure to communicate. In *Thomas*, the defendants' undisclosed X-ray evidence presented new reasons for the expert's opinion. Here, Dr. Wener's testimony that the standard of care required warnings as conditions changed over time did not advance a new theory of negligence or new reasons for his opinion. Plaintiffs disclosed that Dr. Wener would testify to the standard of care for *prenatal* warnings. The disclosures did not specify that he would limit his opinions to particular phases of the prenatal cycle. His testimony that warnings were warranted in the period before the uterine rupture comports with his disclosures and did not advance a new theory of liability. Testimony is not a new opinion merely because it offers a more precise time. *Seef*, 311 Ill. App. 3d at 23.

A case that helps distinguish proper from improper references to time frames is *Firstar Bank of Illinois v. Peirce*, 306 Ill. App. 3d 525, 536-37, 714 N.E.2d 116 (1999). There, we found that the trial court

erred in admitting trial testimony about the standard of care required *after* a medication was administered when the disclosures addressed only the standard of care required *before* the medication was administered. *Firstar*, 306 Ill. App. 3d at 536-37. That was not the situation here. Dr. Wener's disclosures about prenatal warnings referred to the *prenatal* period in general and did not distinguish between warnings to be given before and after the onset of labor. The prenatal period lasted until Hannah was born. The trial court here did not err in admitting Dr. Wener's testimony.

■ Even if we decided that Dr. Wener's testimony was improperly admitted, we cannot say that the error would have warranted reversal. Plaintiffs claim there was enough evidence to support the jury's verdict under theories "a," "b" and "c," so even if theory "d" was tainted by a Rule 213 violation, reversal would not be necessary. Plaintiffs contend that one defective theory of liability will not disturb a general verdict where there was sufficient evidence to sustain the other theories, citing *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 494, 771 N.E.2d 357 (2002); 735 ILCS 5/2—1201(d) (West 2002). Section 2—1201(d) of the Code provides:

> "(d) If several grounds of recovery are pleaded in support of the same claim, whether in the same or different counts, an entire verdict rendered for that claim shall not be set aside or reversed for the reason that any ground is defective, if one or more of the grounds is sufficient to sustain the verdict; nor shall the verdict be set aside or reversed for the reason that the evidence in support of any ground is insufficient to sustain a recovery thereon, unless before the case was submitted to the jury a motion was made to withdraw that ground from the jury on account of insufficient evidence and it appears that the denial of the motion was prejudicial." 735 ILCS 5/2—1201(d) (West 2002).

Defendants contend section 2—1201(d) notwithstanding, the entire verdict must be set aside here because the facts conform to an exception to the general rule that one defective ground is not enough to defeat a verdict. Defendants focus on the clause, "unless before the case was submitted to the jury a motion was made to withdraw that ground from the jury on account of insufficient evidence and it appears that the denial of the motion was prejudicial." 735 ILCS 5/2—1201(d) (West 2002). Defendants allege that the criteria in the exception were met because: (1) defendants moved to withdraw theory "d" before the case was submitted to the jury; (2) their basis for the motion was Dr. Wener's improperly admitted and therefore insufficient evidence; (3) the trial court then denied their motion; and (4) the denial resulted in prejudice to defendants.

But defendants are unable to show prejudice because they cannot show that the jury based its verdict on the instruction at issue. Neither side requested special interrogatories under section 2—1108 of the Code. 735 ILCS 5/2—1108 (West 2002). A defendant cannot expect recourse where a plaintiff presents more than one theory of her case, the defendant does not request special interrogatories and the jury returns a general verdict. *Dillon*, 199 Ill. 2d at 492; *Witherell v. Weimer*, 118 Ill. 2d 321, 329, 515 N.E.2d 68 (1987). Nor can it be presumed that reversal is warranted because the jury was misled by the court's instruction unless there is some indication that the jury was improperly influenced. See *Lynch v. Board of Education of Collinsville Community Unit District No. 10*, 82 Ill. 2d 415, 432, 412 N.E.2d 447 (1980) (it is not automatically presumed that the jury was misled by the judge's erroneous instruction). Without the jury's answer to a special interrogatory on theory "d," we could not conclude that defendants were prejudiced even if Dr. Wener's testimony was admitted in error.

■ Defendants next argue that the trial court erred in failing to inform the jury of Dr. Fletcher's cognitive deficits and the nature of her illness, citing *Eckley v. St. Therese Hospital*, 62 Ill. App. 3d 299, 310, 379 N.E.2d 306 (1978). There, this court recommended that when a witness was unable to appear because of bereavement, the jurors should be told the witness was "temporarily absent from the courtroom for personal reasons." *Eckley*, 62 Ill. App. 3d at 310-11.

Here, the trial court's reference to Dr. Fletcher's absence was even more neutral than the explanation endorsed in *Eckley*. The trial court here twice called the jury's attention to the fact that Dr. Fletcher's testimony would be read and admonished it to give it the same consideration as if she had appeared. We do not believe it would have been less prejudicial to have informed the jury of the nature of Dr. Fletcher's illness and deficits or attributed her absence to "personal reasons."

■ Defendants next argue that the trial court abused its discretion in denying their request to show a video during *voir dire*, depicting a day in the life of Hannah. They rely on *Roberts v. Sisters of Saint Francis Health Services, Inc.*, 198 Ill. App. 3d 891, 900, 556 N.E.2d 662 (1990), where this court found it was proper for a trial court to allow prospective jurors to see a disabled plaintiff during *voir dire* because it allowed the parties to test for prejudice and dismiss biased persons for cause.

A trial court is vested with broad discretion in allowing, or refusing to allow, a day-in-the-life film to be shown to a jury. *Golden v. Kishwaukee Community Health Services Center, Inc.*, 269 Ill. App. 3d

37, 49, 645 N.E.2d 319 (1994). It is not error for a trial court to refuse to show such a film if the defendants are not otherwise prevented from effectively testing the potential jurors' views on the plaintiff's disabilities for bias or prejudice. *Golden*, 269 Ill. App. 3d at 49. Defendants here do not claim, and the record does not show, that they were unable to question potential jurors thoroughly on the question of Hannah's disability. We conclude that the trial court did not abuse its discretion in barring the film.

■ Finally, we address the jury's $1 million award for Hannah's increased risk of future injury. We agree with defendants' argument on appeal that because the plaintiffs' experts could not quantify the risks of future injury due to scoliosis or hip dislocation, the jury award of $1 million cannot be upheld under *Dillon*. There, the supreme court ruled that damages for increased risk of future injury are compensible, but "[t]he burden is on the plaintiff to prove that the defendant's negligence increased the plaintiff's risk of future injuries. A plaintiff can obtain compensation for a future injury that is not reasonably certain to occur, but the compensation would reflect the low probability of occurrence." *Dillon*, 199 Ill. 2d at 504. But "the increased risk must be based on evidence[,] not speculation, and, more importantly, the size of the award must reflect the probability of occurrence." *Dillon*, 199 Ill. 2d at 506. See also *Kamp v. Preis*, 332 Ill. App. 3d 1115, 1121, 774 N.E.2d 865 (2002) (evidence is speculative unless "the increased risk of future injury is proven within a reasonable degree of certainty and is proximately caused by the defendant's negligence").

Here, the testimony of Drs. Thornton and Townsend did not specify the level of increased risk Hannah faces or the probability of injuries. The degree of risk was not proven within a reasonable degree of certainty. The jury's award of $1 million could have been based only on speculation because no tangible evidence was before it. For those reasons, we vacate this portion of the award. See *Mueller v. Soffer*, 160 Ill. App. 3d 699, 706, 513 N.E.2d 1198 (1987) (where the plaintiffs have not established evidence sufficient to support damages, we will vacate the circuit court's award of damages).

We affirm the general verdict and vacate the award of $1 million for increased risk of future injury. Defendants' motion to cite additional authority is denied.

Affirmed in part and vacated in part.

GORDON and McBRIDE, JJ., concur.