# Illinois Official Reports

## Appellate Court

*Brannen v. Seifert*, 2013 IL App (1st) 122067

| | |
|---|---|
| Appellate Court Caption | ADRIANA BRANNEN and STANDARD BANK AND TRUST, Under Trust No. 3265, Plaintiffs-Appellees, v. JOERG SEIFERT, Individually, JOERG SEIFERT, LTD., P.C., and JOERG SEIFERT LAW OFFICES, P.C., Defendants-Appellants. |
| District & No. | First District, Second Division<br>Docket No. 1-12-2067 |
| Filed | November 19, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from the judgment entered for plaintiffs in their legal malpractice action alleging that defendants failed to properly advise them of their remedies in the event of a breach of an agreement for deed they entered into with a third party, the appellate court presumed that the trial court properly exercised its discretion in barring the affirmative defense of contributory negligence due to the incompleteness of the record on appeal, and the reviewing court also found that the opinion of plaintiff's legal expert that plaintiffs were not limited to obtaining possession after the purchasers' default, but could have recovered both possession of the property and the arrearage due, was properly admitted in evidence and the fact that plaintiffs recovered the property did not preclude them from recovering money damages; further, the judgment was reduced by $24.66 to the amount of the damages plaintiffs sustained. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-L-9276; the Hon. James P. Flannery, Judge, presiding. |
| Judgment | Affirmed as modified. |

| Counsel on Appeal | Mulherin, Rehfeldt & Varchetto, P.C., of Wheaton (Patricia L. Argentati and Shana A. O'Grady, of counsel), for appellants. |
|---|---|
| | Robert A. Langendorf, P.C., of Chicago (Philip J. Berenz, of counsel), for appellees. |
| Panel | JUSTICE PIERCE delivered the judgment of the court, with opinion. Presiding Justice Quinn and Justice Harris concurred in the judgment and opinion. |

## OPINION

¶ 1    Plaintiffs, Adriana Brannen, the sole beneficiary of Standard Bank and Trust, trust No. 3265, and Standard Bank and Trust brought a legal malpractice action against the defendants, Joerg Seifert, Brannen's former attorney, and his law firms, Joerg Seifert, Ltd., P.C., and Joerg Seifert Law Offices, P.C., alleging professional negligence in: (a) failing to advise Brannen as to the ramifications of each available remedy under the articles of agreement for deed entered into with a third party and (b) electing to forfeit the agreement without her consent. In March 2012, a jury found in favor of plaintiffs, awarding damages in the amount of $199,500. Defendants raise numerous issues on appeal, including: (1) the trial court erred in (a) denying defendants leave to file the affirmative defense of contributory negligence; (b) improperly allowing plaintiffs' legal expert to opine about an erroneous interpretation of Illinois law; (c) denying defendants' motion for a directed verdict as the third parties were insolvent and plaintiffs had no entitlement to the damages; (d) improperly instructing the jury that plaintiffs were entitled to a double recovery; (e) giving Illinois Pattern Jury Instructions, Civil, No. 60.01 (2006); (f) denying defendants' special interrogatories; and (g) denying defendants' motion for setoff; and (2) the evidence did not support the verdict in favor of plaintiffs. For the following reasons, we affirm as modified.

¶ 2                                   BACKGROUND
¶ 3    On June 30, 2005, plaintiffs entered into a contract entitled "Articles of Agreement for Deed" (the agreement) with Mark and Theresa LeFevour (buyers), for residential property at 17390 Plainfield Road, LaGrange Highlands, Illinois (the property). The property is the corpus of trust No. 3265, held by Standard Bank and Trust. The agreement stated that the LeFevours agreed to buy the property for $625,000, payable in installments. The LeFevours were to pay $102,750 of principle in installments, as follows: $12,500 at closing, $12,250 on or before December 31, 2005, $27,000 on or before December 31, 2006; $33,000 on or before December 31, 2007, $18,000 on or before June 30, 2008 and the remaining principal balance on or before

June 30, 2008. A similar schedule for the payment of interest at 4% was also set forth. In the event of the buyers' default, section 17(a) of the agreement provided the following remedies to plaintiffs:

"A. If Buyer (1) defaults by failing to pay when due any single installment or payment required to be made to Seller under the terms of this Agreement and such default is not cured within ten (10) days of written notice to Buyer; or (2) defaults in the performance of any other covenant or agreement hereof and such default is not cured by Buyer within thirty (30) days after written notice to Buyer (unless the default involves a dangerous condition which shall be cured forthwith); Seller may treat such a default as a breach of this Agreement and Seller shall have any one or more of the following remedies in addition to all other rights and remedies provided at law or in equity: (i) maintain an action for any unpaid installments; (ii) declare the entire balance due and maintain an action for such amount; (iii) forfeit the Buyer's interest under this Agreement and retain all sums paid as liquidated damages in full satisfaction of any claim against the Buyer, and upon Buyer's failure to surrender possession, maintain an action for possession under the Forcible Entry and Detainer Act, subject to the rights of the Buyer to reinstate as provided in that Act.

B. As additional security in the event of a default, Buyer assigns to Seller all unpaid rents, and all rents which accrue thereafter, and in addition to the remedies provided above and in conjunction with any one of them, Seller may collect any rent due and owing and may seek the appointment of a receiver."

Section 18 of the agreement, entitled "Default, Fees," provided:

"B. (1) All rights and remedies given to Buyer or Seller shall be distinct, separate and cumulative, and the use of one or more thereof shall not exclude or waive any other right or remedy allowed by law, unless specifically waived in this Agreement; (2) no waiver of any breach or default of either party hereunder shall be implied from any omission by the other party to take any action or account of any similar or different breach or default; the payment or acceptance of money after it falls due after knowledge of any breach of this Agreement by Seller or Buyer, or after the termination of Buyer's right of possession hereunder, or after the service of any notice, or after commencement of any suit, or after final judgment for possession of the premises shall not reinstate, continue or extend this Agreement nor affect any such notice, demand or suit or any right hereunder not herein expressly waived."

¶ 4    Although the initial payment of $12,500 due at closing was paid, the LeFevours immediately fell behind on their payments. In April 2007, roughly two years after the parties entered into the agreement, plaintiffs retained defendants, Joerg Seifert, Joerg Seifert, Ltd., P.C., and Joerg Seifert Law Offices, P.C., to recover the arrearage from the LeFevours and to regain possession of the property.

¶ 5    Defendants made unsuccessful attempts to collect what the LeFevours owed. The LeFevours remained in possession and in default. Despite directives to collect past amounts owed, plaintiffs alleged that defendants sent a letter to the LeFevours on July 18, 2007, that declared a default and forfeiture of the agreement. Plaintiffs alleged that defendants chose the

forfeiture remedy without consulting them or explaining the consequences of declaring a forfeiture. The LeFevours moved out in November 2007.

¶ 6     Unaware that their right to collect the arrearage had been terminated when defendants declared a forfeiture, plaintiffs retained the services of another law firm to sue the LeFevours for breach of contract. The LeFevours moved to dismiss the breach of contract suit based on the prior declaration of forfeiture. Despite defendants' claim that they did not declare a contract forfeiture, the court found a forfeiture had been declared and dismissed the breach of contract action with prejudice.

¶ 7     After the breach of contract case was dismissed, plaintiffs filed the instant action against defendants for professional negligence. Plaintiffs alleged defendants breached the standard of care owed a legal client: (1) by declaring a forfeiture, such that the LeFevours did not have to pay back rent and, by choosing this remedy, causing any subsequent actions for damages against the LeFevours to be barred; (2) by failing to communicate their wrongdoings to their client; (3) by breaching their fiduciary duties; and (4) by being otherwise careless and negligent. The case proceeded to trial in March 2012.

¶ 8     At trial, Adriana Brannen testified that at the time of trial she was 85 years old and living with her son John. She testified that she is the beneficiary of the trust at Standard Bank and Trust containing the property. In 2005, when the agreement was signed, her son John was helping her with the property. She never saw any checks or payments made by the LeFevours because John handled all of the dealings with the property. The terms of the agreement were that the LeFevours would pay the property taxes and insurance after they moved in. Adriana testified that she ended up paying the taxes and insurance. After the LeFevours stopped paying the installments, Adriana told John to call them because she wanted them out of the property and wanted the money they owed. The LeFevours did not pay, so Adriana instructed John to contact defendants.

¶ 9     Plaintiffs called Joerg Seifert as an adverse witness. Seifert testified that he was a licensed attorney and the corporate representative of Joerg Seifert Limited, P.C., and Joerg Seifert Law Offices, P.C. Seifert knew Adriana and knew that her son John was her representative. Seifert was hired by John Brannen in this matter on April 17, 2007. John initially told Seifert that he wanted the LeFevours to pay what they owed and would give them until the end of July to purchase the house. If the LeFevours did not pay by the end of July, John wanted the contract rescinded and the house placed back on the market. On April 25, 2007, Seifert sent a letter to the LeFevours advising them of the $59,160 arrearage and demanding full payment by the end of June 2007. Seifert sent them a follow-up letter on May 30, 2007, asking about their intention to pay the monies owed. On June 29, 2007, Mark LeFevour responded with a proposed payment schedule. John rejected the payment schedule. On July 3, 2007, Seifert sent a letter to the LeFevours indicating that the new proposed payment schedule was unacceptable and demanded payment of the full arrearage in timely monthly payments or they would be required to buy the property. On July 18, 2007, Seifert sent a letter to the LeFevours informing them that due to the $71,000 in arrearage, "the Seller hereby declares a default and forfeiture pursuant to said agreement and demand is hereby made upon you to immediately vacate the premises but in no event later than July 31, 2007."

¶ 10    The attorney Brannen hired to collect the arrearage sent Seifert an email on September 11, 2007, questioning Seifert's understanding of the forfeiture remedy outlined in the agreement. Seifert responded that he did "not think a forfeiture should be filed, but available to be filed if that is the desired course." Seifert also stated "[s]ince the Brannens' primary objective was to have Mr. Lefevour vacate the premises, I thought putting us into a position to declare forfeiture was the best avenue and did not really think that it would get to a forfeiture and forcible." He went on to say, "[i]f the primary concern is to collect the moneys, then that course of action should be taken." Seifert explained his statement by indicating that although he had declared a forfeiture, he had not recorded it.

¶ 11    From the time Seifert was retained until the LeFevours vacated the property, the LeFevours did not make any payments to plaintiffs. Before he declared a forfeiture, Seifert said John Brannen gave up getting the money owed and continued wanting to regain possession of the property. Seifert testified that there were three options available in the event of a default and he was "confident" that he and John discussed the options available under the agreement, as well as the options available under the provision that allowed for "all other remedies at law and equity."

¶ 12    Seifert testified that he never discussed the ramifications of a forfeiture with Adriana. He testified that "the declaration of forfeiture references the forcible entry and detainer act. And in order to have a forcible entry and detainer action against the LeFevours, the declaration of forfeiture would have to be filed." Seifert testified that he never explained anything in writing to Adriana or John about the consequences of choosing a forfeiture. Seifert testified that he orally explained to John the consequences of a forfeiture. Seifert testified that the legal services he provided plaintiffs satisfied the standard of care and that no negligent act or omission on his part caused damage to plaintiffs.

¶ 13    Seifert testified that John Brannen attempted to sue the LeFevours for the arrearage after plaintiffs had regained possession of the property. That suit was unsuccessful due to Seifert's declaration of forfeiture. Seifert testified that he believed, under these particular facts and circumstances, that a declaration of forfeiture was the "only course of action" in order to get the property back from the LeFevours without prolonged litigation.

¶ 14    Seifert then testified for the defense. After he was retained by John Brannen, Brannen told him that the LeFevours had been living at his mother's property for almost two years without making payments. Seifert testified that he explained to John the default remedies available under the agreement. He also explained the ramifications of declaring a forfeiture because "it's so unique." Initially, John said his primary goal was to get the money owed under the agreement. Later, John expressed his mother's frustration with the matter and indicated that she wanted the LeFevours out of the house and wanted the property back. Seifert testified that plaintiffs wanted to put the house back on the market.

¶ 15    Mark LeFevour sent an email to Seifert and John Brannen requesting additional time to secure financing and requesting that plaintiffs accept a lump sum to cover the arrearage and allow them to stay until June 2008. John Brannen told Seifert that the only way his mother would not rescind or forfeit the contract was if the LeFevours paid the total amount due. Seifert communicated this information to Mark LeFevour.

¶ 16    Seifert testified that he wrote a letter to Cornelius Brown, the attorney for the LeFevours, on August 9, 2007. In this letter, Seifert explained the financial terms that would allow the LeFevours to remain in the property. Seifert also indicated that if they did not pay, they would have to vacate the premises immediately. Seifert testified that he generated the notice of intention to declare forfeiture directed to the LeFevours. The copy contained in the record is unsigned and undated and does not provide a date by which the default must be cured. The actual declaration of forfeiture contained in the record is unsigned and dated August 20, 2007, there is no indication it was recorded.

¶ 17    On cross-examination, Seifert testified that he received an email from John Brannen in August 2007, requesting money from the LeFevours. Seifert took that to mean that plaintiffs would not allow the LeFevours to remain in the property without paying the arrearage. Seifert indicated that the notice of intent to declare forfeiture did not state that all arrearage is waived once the contract is forfeited. Seifert testified that declaring a forfeiture is "unusual" and agreed that it is "unusual" because the same thing can be accomplished under a forcible entry action.

¶ 18    Attorney Jarret Raab testified that his firm filed suit on behalf of Adriana Brannen against Mark LeFevour for breach of contract. In preparation for litigation, Raab spoke with Seifert in early 2008, who advised him that he had threatened to forfeit the agreement but did not actually declare a forfeiture.

¶ 19    Raab testified that the lawsuit against LeFevour had several different legal theories, but the primary basis was a breach of contract. The breach of contract claim was dismissed when the court ruled that the contract had been forfeited, making it no longer enforceable. Raab billed Adriana $39,435.44 for his work on the lawsuit.

¶ 20    On cross-examination, Raab testified John acted as Adriana's representative. Raab testified that before he filed suit, he was not aware that there had been a declaration of forfeiture. Raab was only aware of a document called a notice of intent to forfeit.

¶ 21    John Brannen testified that at the time of trial he was a real estate broker. After the LeFevours expressed an interest in buying the house, Mark LeFevour drafted a contract for purchase and presented it to John, who discussed its terms with his mother. John told Seifert that he and his mother were interested in a contract for the sale of the house, not a lease. Seifert redrafted the agreement, which was executed by the parties.

¶ 22    The LeFevours made a down payment of $12,500 and wrote two additional checks at the end of the year, one for principle and one for interest. However, Mark asked John not to cash the check for principle. The last payment received by the LeFevours was in December 2006. The LeFevours left the property in November 2007. In total, the LeFevours paid $19,350 after moving into the property and those payments were applied to the interest owed.

¶ 23    The total unpaid interest and principal owed by the LeFevours for the time they occupied the residence was $144,103: $102,850 in principal and $73,203 in interest, minus the $19,350 in payments made. The LeFevours also owed $13,342.90 in property taxes and $2,594 in insurance. John testified that he was unable to get a judgment for the balance owed because the contract had been forfeited and they could not get any further payments from the LeFevours.

John testified that he never instructed Seifert to forfeit the right to the principle, interest, taxes or insurance due.

¶ 24    John contacted Seifert in April 2007 and hired him to collect the money due, instructing Seifert to tell the LeFevours that if they were not going to pay they would be removed from the property. John wrote to Seifert and indicated that his mother wanted to be fully paid, they would be given 90 days to purchase the house otherwise his mother would rescind the contract. John testified that he never told Seifert that he was giving up pursuing the amount owed or instructed Seifert to stop seeking the monies owed. John testified that when Seifert sent a letter to the LeFevours indicating that if they did not pay the $59,160 owed at that time, he would take the steps necessary to declare a forfeiture. Seifert never explained that declaring a forfeiture would result in the termination of the agreement, thereby precluding recovery of the monies owed.

¶ 25    John received a copy of a letter sent by Seifert to the LeFevours on July 18, 2007. That letter stated:

> "Please be further advised that your continued failure to make the required payments pursuant to the Articles of Agreement for Deed entered into by and between you and my client has resulted in an arrearage in excess of $71,000.
>
>   As a result of the same, the seller hereby declares a default and forfeiture pursuant to said agreement and demand is hereby made upon you to immediately vacate the premises but in no event later than July 31, 2007. Please be further advised that in the event the property is not vacated, my client shall take such steps necessary to seek legal and equitable resolution and restitution as a result of your breach."

Seifert told John the letter meant "it was an intent to forfeit, almost like a threat for them to pay."

¶ 26    Subsequently, John hired Raab to collect what was owed by the LeFevours. Had he known that their rights and remedies had been lost by the forfeiture he "probably" would not have filed suit to collect the money owed. When John inquired about the forfeiture after the lawsuit, Seifert stated that he did not believe there was a forfeiture. After the forfeiture had been declared, Seifert sent an email to Cornelius Brown, the LeFevours' attorney, dated August 30, 2007, stating the "discussion on waiving the over $70,000 in deficiencies shall not be entertained."

¶ 27    Plaintiffs' expert, Brendan Appel, testified that defendants breached the standard of care: (1) because defendants failed to fully advise their clients as to the available remedies and as to the ramifications of each remedy and allowed the clients to select which course of action to take by not properly informing his clients; and (2) choosing an incorrect remedy without the consent of his client especially when John Brannen expressed his mother's intention on several occasions to collect what was owed through the point when the LeFevours vacated the premises. Further, he opined that the agreement and Illinois law, specifically the Forcible Detainer and Entry Act (735 ILCS 5/9-102(a)(5) (West 2006)), provided the option for plaintiffs to regain possession of the property without terminating their right to file a breach of contract action to recover the arrearage.

¶ 28 Cornelius Brown testified for the defense. When he was retained by the LeFevours in 2007, they still lived in the property but owed arrearage under the agreement. During his negotiations with Seifert he conveyed his clients' desire to remain in the house and rework the payment schedule because of their financial situation. The LeFevours had discussed the possibility of bankruptcy with Brown.

¶ 29 Brown explained his concept of forfeiture. Brown asserted a forfeiture under a sales contract is where the buyer forfeits the payments made toward the purchase of the property and those payments become rent. The buyer then becomes a tenant. Under the terms of this agreement, the sellers had three remedies in the event of the LeFevour's default: sue for money damages, specific performance and forfeiture.

¶ 30 Brown testified that in his opinion, Seifert's declaration of forfeiture was the appropriate course of action. Brown explained that pursuing the LeFevours for money damages would have been futile because they had no money to pay the payments due. He further opined that joint actions, actions for possession and money damages, are almost never filed. Theoretically, plaintiffs had other rights and remedies provided at law or in equity.

¶ 31 With respect to Mark LeFevour's solvency, Brown testified that he was aware that Mark earned a six-figure salary and had recently paid all of his tax liens. Brown testified that he was not aware that Mark recently paid off a $100,000 line of credit, that he has somewhere between 50 and 100 contingency fee cases pending or that he had just bought a 2012 Ford. Brown testified that he based his decision that the LeFevours were having financial difficulty on their debts and income. Brown testified that he used the threat of bankruptcy as leverage. He also testified that the forcible entry and detainer statute would be applicable to the agreement.

¶ 32 Joseph Fortunato testified as a legal expert for the defense. He agreed that the agreement provided three separate remedies in the event of the LeFevours' default. Fortunato testified that when a contract contains specific remedies for a breach, those contract remedies supercede general remedies. Fortunato testified that because the LeFevours moved out after receiving the notice of intent to declare a forfeiture, no further action was necessary. Fortunato opined that, because the contract specified that payments made through the date of forfeiture were considered liquidated damages, plaintiffs could not regain possession and recover the arrearage because that would amount to a double recovery. Fortunato testified that in Illinois, where a contract provides for different remedies, a plaintiff may select only one remedy.

¶ 33 In his opinion, Seifert's election of the forfeiture remedy satisfied the duties and standards of care owed to plaintiffs. Fortunato explained that selecting the forfeiture remedy was the "most prudent" course of action because the goal was to get the property back on the market. Therefore, defendants did not cause any damage to plaintiffs.

¶ 34 Fortunato testified as to Mark LeFevour's solvency. Fortunato read the materials relevant to this case and found emails from Mark indicating that he did not have the ability to make the contractual payments. Fortunato did not see anything that indicated Mark's representations were false or that he had the ability to pay and was choosing not to. An attorney, when making a decision as to what course of action to take, has to consider the opposing party's ability to pay. Otherwise, the plaintiff will end up with an unenforceable judgment. Fortunato opined

that, under the facts of this case, a reasonable attorney would have elected to declare a forfeiture and not pursue money damages from the LeFevours based on their inability to pay.

¶ 35    Fortunato stated that he did not believe that the forfeiture declaration was recorded in the recorder's office. He stated that once the notice of intention to declare a forfeiture was sent to the LeFevours, they moved out and that precluded the necessity to take further action. Fortunato testified that a suit under the Forcible Entry and Detainer Act would not be appropriate in this case because a declaration of forfeiture and a notice of forfeiture are required, which would have terminated plaintiffs' rights to seek money damages under the contract. Fortunato testified that because defendants elected forfeiture under the terms of the agreement, which provided for liquidated damages, plaintiffs would be precluded from seeking any other damages. Fortunato further testified that even though the agreement allows for plaintiffs to seek other remedies in law and equity, one cannot seek damages in addition to liquidated damage under the terms of the agreement.

¶ 36    At the conclusion of the trial, a unanimous jury returned a verdict in favor of plaintiffs finding defendants liable for legal malpractice. The jury awarded "total damages sought" in the amount of $199,500. Defendants posttrial motions seeking reversal or a new trial were denied. Defendants filed a timely appeal.

¶ 37                                        ANALYSIS
¶ 38    Defendants raise numerous issues on appeal. We address each issue in turn.


¶ 39                                Affirmative Defense
¶ 40    Defendants first argue that the trial court erred in denying their motion for leave to file an affirmative defense of contributory negligence. Defendants acknowledge that they sought leave to file this affirmative defense on the first day of trial, but argue that their late filing was due to plaintiffs' recent acknowledgment that John Brannen acted as a representative of plaintiffs for the purposes of establishing agency.

¶ 41    Defendants sought leave to file their affirmative defense, alleging John Brannen's contributory negligence insofar as he failed to comply with his duty to exercise ordinary and reasonable care in that he specifically instructed defendants to declare a forfeiture of the installment contract, rejected any further discussion by defendants regarding the remedies available under the contract, negligently misrepresented to defendants familiarity with the terms and conditions of the land contract, and/or negligently misrepresented to defendants familiarity with rescission and/or forfeiture of the land contract. Defendants alleged that any and all of these negligent acts were a proximate cause of plaintiffs' alleged injuries and that those acts constituted in excess of 50% of the proximate cause of the alleged injuries.

¶ 42    The trial court's decision to allow an amendment to the pleadings lies within the discretion of the trial court and the decision will not be overturned absent an abuse of discretion. *1515 North Wells, L.P. v. 1513 North Wells, L.L.C.*, 392 Ill. App. 3d 863, 870 (2009). As plaintiffs point out, defendants do not identify the basis of the trial court's decision to deny their motion for leave to file the affirmative defense of contributory negligence. Our review of the record

shows that there is no order denying defendant's request for leave to file an amendment; the record only contains an order granting the plaintiff's motion to bar the use of the affirmative defense of contributory negligence. As a result, we do not have a sufficient basis to review the propriety of the trial court's ruling to determine whether it appropriately exercised its discretion in this regard. As the movants, defendants have the burden to present a sufficiently complete record to support a claim of error, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with the law and had a sufficient factual basis. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). Any doubts that may arise from the incompleteness of the record will be resolved against the appellant. *Foutch*, 99 Ill. 2d at 392. Accordingly, we construe the record in this case against defendants and assume the order was proper.

¶ 43                                    Expert Testimony

¶ 44         Defendants next argue the trial court improperly allowed plaintiffs' legal expert to testify regarding opinions that were contrary to Illinois law and lacked a proper foundation because the opinion was not based on the law.

¶ 45         The failure to present expert testimony in a legal malpractice action is usually fatal to the claims. *Barth v. Reagan*, 139 Ill. 2d 399, 408 (1990). Expert testimony is admissible if the expert is qualified by knowledge, skill, experience, training, or education, and the testimony would assist the jury in understanding the evidence. *Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003). A witness may be qualified as an expert once it is shown that he or she possesses special knowledge beyond that of an average person on a factual matter relevant to the litigation. *National Surety Corp. v. Fast Motor Service, Inc.*, 213 Ill. App. 3d 500, 508 (1991). Though the trier of fact bears the responsibility of assessing the credibility of expert witnesses when they offer different opinions, there is an expectation that the conflict will be resolved by evaluating the relative merits of the experts and their opinions. *LaSalle Bank, N.A. v. C/HCA Development Corp.*, 384 Ill. App. 3d 806, 828 (2008) (citing *Bergman v. Kelsey*, 375 Ill. App. 3d 612, 626-27 (2007)). The decision of whether to admit expert testimony is within the trial court's sound discretion. *Thompson v. Gordon*, 221 Ill. 2d 414, 428 (2006).

¶ 46         Prior to trial, the trial court denied defendants motion *in limine* to bar the testimony of plaintiffs' expert, Brendan Appel. At trial, Appel testified about his background and his familiarity with the facts and the articles of agreement at issue. Appel testified that there are situations when forfeiture is the appropriate remedy. In this case, because the LeFevours almost immediately defaulted, forfeiture was not the appropriate remedy. Rather, the plaintiffs should have declared a breach of contract without declaring a forfeiture. This would have allowed them to recover the unpaid installments from the LeFevours. Appel explained that the contract provides, in addition to listing specific remedies, that the parties may seek remedies "in addition to all other rights and remedies provided at law or in equity." Because of this clause, plaintiffs could have had both the right to possession and all amounts past due under the contract. This contractual language, Appel testified, would allow for plaintiffs to bring a breach of contract action seeking the amount due under the agreement without declaring a forfeiture of the contract. After filing such an action, plaintiffs should then have filed a

"Forcible Entry and Detainer" suit under the Illinois Forcible Entry and Detainer Act (the Act) (735 ILCS 5/9-102(a)(5) (West 2006)).[1] Appel testified that to regain possession of the property and preserve the right to the arrearage, defendants should have:

> "declare[d] a breach, do your ten-day notice. If no payment was received within ten days, declare the buyers to be in breach of the contract. If they refused to voluntarily vacate the property, file a forcible entry and detainer action, include a claim for damages or reserve it for later, and recover possession of the property and sue for the available damages to you."

¶ 47     Defendants contend that Appel's interpretation of the applicable law in this case was faulty, both because Illinois law holds that a forfeiture is required to regain title on a land contract subsequent to a breach and because double recoveries are impermissible in Illinois. Defendants argue that Illinois law prohibits a land contract vendor from recovering both the property and all past due amounts under the contract. Thus, the crux of defendants' position is that because plaintiffs regained possession of the property and retained the payments the LeFevours made as liquidated damages, they were not also entitled to damages for the unpaid amount due under the contract because that would amount to a double recovery for plaintiffs.

¶ 48     A plain reading of the Act shows that defendants' contention is incorrect. Section 9-102(a)(5) of the Act provides that where the vendee is in default, the vendor may regain possession of the property if the vendee has not yet paid the equivalent of 20% of the total purchase price and the installment obligation does not exceed a 5-year period. 735 ILCS 5/9-102(a)(5) (West 2006). The statute's requirements were clearly met in this case. At the time of the LeFevours' breach, they had paid less than 20% of the purchase price and the contract called for installment payments for less than 5 years. Contrary to defendants' position,

---

[1] Section 9-102(a)(5) reads that an action may be maintained when:

> "(a) The person entitled to the possession of lands or tenements may be restored thereto under any of the following circumstances:
>
> * * *
>
> (5) When a vendee having obtained possession under a written or verbal agreement to purchase lands or tenements, and having failed to comply with the agreement, withholds possession thereof, after demand in writing by the person entitled to such possession; provided, however, that any such agreement for residential real estate as defined in the Illinois Mortgage Foreclosure Law entered into on or after July 1, 1987 where the purchase price is to be paid in installments over a period in excess of 5 years and the amount unpaid under the terms of the contract at the time of the filing of a foreclosure complaint under Article XV, including principal and due and unpaid interest, is less than 80% of the original purchase price shall be foreclosed under the Illinois Mortgage Foreclosure Law.
>
> This amendatory Act of 1993 is declarative of existing law." 735 ILCS 5/9-102(a)(5) (West 2006).

there is nothing in section 9-102(a)(5) that requires a vendor to forfeit a contract before electing to proceed in regaining possession. In addition, there is nothing in section 9-102(a)(5) that prohibits a vendor from first seeking past-due amounts in a breach of contract action or seeking past due amounts and possession in a multicount action. In fact, defendants' witness Cornelius Brown testified to the same effect stating that actions for money and possession were possible, just not done frequently.

¶ 49　　　The purpose of the Act is to provide a prompt recovery of possession where a contract purchaser is in default yet remains in possession of the property. *Campana Redevelopment, LLC v. Ashland Group, LLC*, 2013 IL App (2d) 120988, ¶ 13. Although it deals with a separate section of the Act, we recently noted in *Campana* that section 9-209 allows for a landlord to pursue both a claim for possession and a claim for unpaid rent. *Id*. ¶ 14; 735 ILCS 5/9-209 (West 2010).[2] The same relief is available to contract vendors. 735 ILCS 5/9-106 (West 2006) ("a claim for rent may be joined in the complaint, and judgment may be entered for the amount of rent found due"). Therefore, Appel did not render an opinion that was a misstatement of the law and the trial court did not err in allowing his testimony.

¶ 50　　　Defendants further argue Appel's opinion was a misstatement of the law because his opinion informed the jury that plaintiffs were entitled to a double recovery, possession and money damages, due to the LeFevours' breach. Defendants argue that when the forfeiture was declared and plaintiffs regained possession, they were then barred from suing for contract damages. Citing *Hepperly v. Bosch*, 172 Ill. App. 3d 1017, 1022 (1988), defendants argue that the seller under a real estate installment contract cannot both forfeit the contract, regain the real estate, and sue under the contract for actual damages.

¶ 51　　　Defendants are correct in this limited statement of contract forfeiture law, but are incorrect as to its applicability to this factual situation. The gist of plaintiffs' legal malpractice claim was that after default, plaintiffs wanted and were entitled to both possession under the Act and money damages in a breach of contract action and, as a result of defendants' negligence in declaring a contract forfeiture, they were precluded from obtaining full relief. Plaintiffs sought contract damages and were denied this relief when a separate court ruled defendants had previously declared a forfeiture of their contract. It was this judicial finding that deprived plaintiffs of their right to recover contract damages.

¶ 52　　　Plaintiffs' breach of contract action against the LeFevours was dismissed in the circuit court due to the defendants' declaration of forfeiture. See *Benedetti & Sons, Inc. v. O'Malley*, 124 Ill. App. 3d 500 (1984). However, that is not the issue in this case. The issue here is whether defendants were professionally negligent in declaring a forfeiture of the contract foreclosing the recovery of contract damages, when an alternate remedy would have allowed plaintiffs to regain possession of the property and seek recovery of the unpaid installments.

---

[2]Section 9-209 states in relevant part that "[a] claim for rent may be joined in the complaint, and a judgment obtained for the amount of rent found due, in any action or proceeding brought, in an action of forcible entry and detainer for the possession of the leased premises, under this section." 735 ILCS 5/9-209 (West 2010).

¶ 53 Citing *Bales v. Nelson*, 148 Ill. App. 3d 7 (1986), defendants claim that a seller cannot evict a purchaser under a land contract without first declaring a forfeiture of the contract. Defendants argue that the following language from *Bales* is dispositive of the issue before us: "It is our opinion that a vendor is normally not entitled to possession until after the forfeiture has been properly declared." *Id*. at 10.

¶ 54 This language is not dispositive of the issues in this case. The issue in *Bales* was whether the purchaser had abandoned the property and whether the purchaser's right of possession was terminated absent a forcible entry and detainer action, which is not the issue here. The *Bales* holding affirmed only that abandonment of property may be deduced from the factual circumstances presented and that a vendor may properly retake possession when the conduct of the vendee evidences the abandonment not only of the property but the contract as well. *Bales*, 148 Ill. App. 3d at 10. Further, the *Bales* court made clear this statement was only an "opinion" of the court, offering no supporting citation. *Id*. The statement defendants urge this court to rely on is judicial *dictum* and has no bearing on the ultimate issues and holding of this case. *Cates v. Cates*, 156 Ill. 2d 76, 80 (1993) (judicial *dictum* is a remark or opinion of a court that is not essential to the disposition of the cause and is not binding as authority or precedent within *stare decisis*).

¶ 55 The clear language of the agreement states that the "Seller shall have any one or more of the following remedies in addition to all other rights and remedies provided at law or in equity." In addition, although not mentioned by the parties here, section 18 of the agreement provides that "[a]ll rights and remedies given to Buyer or Seller shall be distinct, separate and cumulative, and the use of one or more thereof shall not exclude or waive any other right or remedy allowed by law, unless specifically waived in this Agreement." When language of a contract is plain and unambiguous the court must determine the intent of the parties solely from the plain language of the contract. *Premier Title Co. v. Donahue*, 328 Ill. App. 3d 161, 164 (2002). Clearly, the plain language of the agreement, specifically sections 17 and 18, grant plaintiffs any and all remedies allowed by Illinois law should the LeFevours default, including regaining possession and recovery of any arrearage owed. Indeed, Illinois has no public policy against cumulative remedies. *Crown Life Insurance Co. v. American National Bank & Trust Co. of Chicago*, 35 F.3d 296, 299 (7th Cir. 1994). Because the forfeiture terminated the contract, plaintiffs were precluded from seeking the arrearage. Plaintiffs were entitled under sections 17 and 18 of the agreement, and the Act, to sue for breach of contract, *i.e.*, the arrearage owed, and to seek possession in separate or combined actions.

¶ 56 We therefore see no reason why plaintiffs could not have recovered both the arrearage and possession of the property, either in separate, concurrent or consecutive actions, and we find no bar to the approach suggested by Appel. The agreement expressly allowed plaintiffs to seek whatever remedies were available, including cumulative remedies. Consequently, we cannot say that the court erred in allowing Appel's opinion.

¶ 57                                        Directed Verdict

¶ 58 Defendants argue that the trial court erred in denying their motion for a directed verdict because plaintiffs failed to meet their burden to show that the LeFevours were solvent and that

- 13 -

the damages plaintiffs sought, and were ultimately awarded by the jury, equate to a double recovery for which plaintiffs are not entitled.

¶ 59        Directed verdicts are to be entered only when the evidence viewed in the light most favorable to the nonmovant is so overwhelmingly favorable to the movant that no contrary verdict could have been reached. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). When reviewing the denial of a directed verdict, a reviewing court will not substitute its own judgment for that of the jury's or attempt to reweigh the evidence or credibility of the witnesses. *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 89 (2002). A trial court's denial of a directed verdict as well as its denial of a motion for judgment notwithstanding the verdict is reviewed *de novo*. *Buckholtz v. MacNeal Hospital*, 337 Ill. App. 3d 163, 167 (2003).

¶ 60        Defendants contend that a verdict should have been directed in their favor because the evidence does not support every element of a legal malpractice cause of action. Specifically, defendants argue that plaintiffs failed to establish at trial that the LeFevours were solvent.

¶ 61        In order to sustain an action of legal malpractice, a plaintiff must establish facts supporting three elements: (1) the attorney owed the plaintiff a duty arising from the attorney client relationship; (2) the attorney breached that duty; and (3) the attorney's breach proximately caused the plaintiff to sustain actual damages. *Fox v. Seiden*, 382 Ill. App. 3d 288, 294 (2008). As to the third element, defendants contend that a plaintiff has the burden to prove that, but for the legal malpractice, the plaintiff would have won a judgment against a solvent defendant citing *Sheppard v. Krol*, 218 Ill. App. 3d 254, 259 (1991).

¶ 62        In *Sheppard*, plaintiff claimed the defendant attorney negligently failed to obtain a judgment against an unknown manufacturer in a product liability action. In addition to other pleading deficiencies, the plaintiff could not identify the manufacturer and therefore could not prove that he would have recovered damages. Recognizing the requirement of proving a "case within [a] case," the court found any recovery in the underlying case would have been based on speculation. *Id*. at 260. The *Sheppard* court did state that the plaintiff must plead and prove the existence of a solvent defendant in the underlying claim, citing *Goldzier v. Poole*, 82 Ill. App. 469, 471 (1899) (see also *Kohler v. Woollen, Brown & Hawkins*, 15 Ill. App. 3d 455, 458 (1973)). In *Goldzier*, plaintiff's underlying case was dismissed and at the time of re-filing the underlying defendant was insolvent. The court held that damages beyond nominal damages require the plaintiff to establish the validity of his claim and "the fact that it could in part or in whole have been realized had the attorney not been negligent." *Goldzier*, 82 Ill. App. at 472.

¶ 63        In this case, the jury was instructed that to find for plaintiff, the jury also had to find that the LeFevours were solvent: "plaintiff would have been able to collect a judgment against the LeFevours either in whole or in part." *Bloome v. Wiseman, Shaikewitz, McGivern, Wahl, Flavin & Hesi, P.C.*, 279 Ill. App. 3d 469, 478 (1996). "The proof necessary to satisfy the solvency requirement is distinctly different from the proof required to establish a *prima facie* case. The exact nature of the proof will be dictated by the nature of the underlying case." *Id*. Proof of solvency of the underlining defendant in a specific dollar amount is not required and the negligent attorney should bear the risk of uncertainty of proof concerning collectability. *Visvardis v. Ferleger*, 375 Ill. App. 3d 719, 726 (2007).

¶ 64　　　*Visvardis* was critical of the holding in *Goldzier* because of the unfairness of imposing the burden of proving solvency on the plaintiff and its lack of precedential value. *Id*. We agree with the criticism but find it unnecessary to comment further because the evidence here was such that the jury had ample basis to find in favor of plaintiffs on the issue of solvency. Defendants argue that the evidence shows that the LeFevours were insolvent and would have filed for bankruptcy if the plaintiff had secured a judgment against them. Defendants rely on the deposition testimony of Mark LeFevour who stated he was unable to make payments to plaintiffs on the installment contract because of his financial difficulties and, if forced to make back payments, he would have had to file bankruptcy. Defendants also point to testimony of the LeFevours' attorney, Cornelius Brown, who stated that he discussed bankruptcy with the LeFevours and that due to their financial condition, bankruptcy was a serious course of action being considered.

¶ 65　　　However, despite Mark LeFevour's self-serving statements, the record shows that there was sufficient evidence from which the jury reasonably could have concluded that the LeFevours were solvent. Mark LeFevour was a partner in a law firm with numerous unsettled contingent fee cases. He sold his prior home for a profit. Appel, plaintiffs' expert witness, testified that the fact that Mr. LeFevour had tax liens against him, which had been paid in full, indicates that he had a high income and earning potential. Furthermore, despite the testimony that the LeFevours were considering filing for bankruptcy, they never did file for bankruptcy protection.

¶ 66　　　When evidence is presented that would allow the jury to reasonably resolve a question of fact, a reviewing court will not substitute its judgment of that fact for the jury. *Donaldson*, 199 Ill. 2d at 89. Taken in the light most favorable to the plaintiffs, the record supports the jury's finding of fact that the plaintiffs would have realized damages from the LeFevours, in whole or in part, but for defendants' negligence, thereby satisfying the solvency component of the damage element in a legal malpractice action.

¶ 67　　　Defendants also contend that the trial court erred in denying their motion for a directed verdict because plaintiffs were not entitled to any additional damages, where plaintiffs had already recovered the property from the LeFevours.

¶ 68　　　As we have discussed at length, under the facts and law applicable to this case, there is no legal impediment to plaintiffs' recovery of possession and damages proximately caused by the default in the underlying contract case or in the instant legal malpractice case. The Act does not specifically prohibit a return of property in addition to the recovery of an arrearage owed. The agreement expressly provided for the plaintiffs to be able to seek out whatever remedies were available. Consequently, as plaintiffs were entitled to the damages sought, the trial court did not err in denying defendants' motion for a directed verdict on this issue.

¶ 69　　　　　　　　　　　　　　　　　Jury Instructions

¶ 70　　　Defendants argue, in a nonspecific fashion, that "the jury instructions improperly and inaccurately instructed the jury that the plaintiff [*sic*] was entitled to both a return of the property and recovery of money damages, amounting to a double recovery." Defendants repeat the argument that under Illinois law the only way the plaintiffs could have recovered the

property, was to have forfeited the contract with the LeFevours. We have discussed this contention previously and a review of the record shows the jury was not instructed in this manner and, therefore, this argument is without merit.

¶ 71　Before we address the merits of defendants' argument, we note that defendants argue generally that the "jury instructions" improperly and inaccurately instructed the jury. However, defendants do not identify which specific jury instructions they are complaining of and provide no citations to the record. The failure to substantiate factual assertions with appropriate citation to the record warrants the dismissal of an appeal because it makes it "next to impossible for this court to assess whether the facts as presented *** are an accurate and fair portrayal of the events in this case." *Collier v. Avis Rent A Car System, Inc.*, 248 Ill. App. 3d 1088, 1095 (1993). Consequently, to the extent defendants generally complain of the inadequacies of the jury instructions by making nonspecific and sweeping conclusions, we decline to address the merits of defendants' argument.

¶ 72　Defendants do specifically argue that the trial court erred in instructing the jury using Illinois Pattern Jury Instructions, Civil, No. 60.01 (2006) (hereinafter IPI Civil (2006) No. 60.01) because there had been no testimony or evidence as to any violation of any rule, or guidance to the jury on how the relevant rules applied. Further, defendants contend that because the attorney disciplinary rules do not have the force of law these instructions were improper.

¶ 73　The trial court allowed, over the defendants' objection, two of plaintiffs' instructions based on IPI Civil (2006) No. 60.01, citing the Illinois Rules of Professional Conduct. The following instructions were read to the jury:

"There was in force in the State of Illinois at the time of the occurrence in question a certain Supreme Court Rule of Professional Conduct which provided that, a lawyer shall abide by a client's decisions concerning the objectives of representation and shall consult with the client as to the means by which they are to be pursued.

If you decide that the defendants violated the Supreme Court Rule of Professional Conduct on the occasion in question, you may consider that fact together with all of the other facts to what extent, if any, defendants were professionally negligent before and at the time of the occurrence.

There was in force in the State of Illinois at the time of the occurrence in question a certain Supreme Court Rule of Professional Conduct which provided that, a lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

If you decide that the defendants violated the Supreme Court Rule of Professional Conduct on the occasion in question, you may consider that fact together with all of the other facts to what extent, if any, defendants were professionally negligent before and at the time of the occurrence."

¶ 74　The decision to provide a particular jury instruction is within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion. *Matarese v. Buka*, 386 Ill. App. 3d 176, 178 (2008). The standard for deciding whether a trial court has abused its

discretion allowing a jury instruction is whether the instruction, taken as a whole, fairly, fully, and comprehensively apprised the jury of the relevant legal principles and is an accurate statement of the law. *Id*.

¶ 75        It is well established that jury instructions may quote portions of statutes and ordinances when the jury has heard evidence that the quoted portions of the statute or ordinance have been violated and the party tendering the instruction alleges the violation breached the duty owed to him by defendant. *Mayol v. Summers, Watson & Kimpel*, 223 Ill. App. 3d 794, 810 (1992). Because legal malpractice actions involve conduct failing to adhere to certain minimum standards, ethical standards are relevant considerations. *Rogers v. Robson, Masters, Ryan, Brumund & Belom*, 74 Ill. App. 3d 467, 472-73 (1979); *Nagy v. Beckley*, 218 Ill. App. 3d 875, 879 (1991). Like most statutes and ordinances, attorney disciplinary rules establish minimum standards of conduct and are intended to protect the general public. *Mayol,* 223 Ill. App. 3d at 810. Thus, in a legal malpractice action, juries may properly consider standards of professional ethics pertaining to attorneys because such suits involve allegations of conduct that does not conform to minimum professional standards. *Id*.

¶ 76        In this case, plaintiffs clearly complained of attorney negligence that caused them damages by not being able to recover contract damages due to defendants declaring a contract forfeiture. Clearly, plaintiffs advanced an action sounding in tort and they alleged and proved more than the failure to adhere to the rules of professional conduct.

¶ 77        Appel testified as to the standard of care defendants owed plaintiffs and that such standard of care was breached. He did not cite specifically to the particular section of the Illinois Rules of Professional Conduct but his testimony fairly summarized the rules that were contained in the court's instructions. Instructions concerning violations of statutes may be given when evidence is adequate to support a finding that a violation occurred. *Harris v. Day*, 115 Ill. App. 3d 762, 773 (1983); *Mayol*, 223 Ill. App. 3d at 810. Here, we find that there was more than ample support in the record to give the jury these instructions regarding the standards of professional conduct. These instructions did not misinform the jury. The instructions did not unduly emphasize the rules because the jury was instructed that if they found defendants did not adhere to a rule it was permissive to consider that finding along with all the other evidence in determining whether, if at all, defendants were professionally negligent. These instructions did not prejudice defendants or prevent them from receiving a fair trial.

¶ 78                                    Special Interrogatory

¶ 79        Next, defendants contend that after permitting IPI Civil (2006) No. 60.01, the trial court should have allowed defendants' special interrogatory to the jury regarding the Rules of Professional Conduct. They contend the court committed reversible error in refusing the proposed special interrogatory.

¶ 80        Section 2-1108 of the Illinois Code of Civil Procedure provides that special interrogatories are "required on request of any party, to find specially upon any material question or questions of fact submitted to the jury in writing." 735 ILCS 5/2-1108 (West 2006). We review the submitting or refusing of a special interrogatory *de novo*. *Id*.

- 17 -

¶ 81 The purpose of a special interrogatory is not to instruct the jury, but to serve as a check on the jury's deliberation and to enable the jury to determine one or more specific issues of ultimate fact. *Simmons v. Garces*, 198 Ill. 2d 541, 555 (2002). A trial court has discretion to refuse to submit a special interrogatory to the jury that is not in proper form. *Curatola v. Village of Niles*, 324 Ill. App. 3d 954, 960 (2001); *Thomas v. Johnson Controls, Inc.*, 344 Ill. App. 3d 1026, 1033 (2003). To be in proper form, a special interrogatory should consist of a single, direct question, should not be repetitive, misleading, confusing or ambiguous and should use the same language contained in the jury instruction. *Id*. In addition, it should relate to an ultimate question of fact upon which the rights of the parties depend, and an answer responsive to it must be inconsistent with a general verdict. *Id*. A special interrogatory's response is inconsistent with a general verdict only where it is "clearly and absolutely irreconcilable with the general verdict." (Internal quotation marks omitted.) *Simmons,* 198 Ill. 2d at 555-56. A trial court has no discretion to reject a special interrogatory that is submitted in proper form, but may reject those they find to be improper. *McGovern v. Kaneshiro*, 337 Ill. App. 3d 24, 30 (2003). Refusal to submit a proper special interrogatory to the jury is reversible error, so long as such an error is not harmless. *Van Hattem v. K mart Corp.*, 308 Ill. App. 3d 121, 132 (1999).

¶ 82 The special interrogatory submitted by defendants, and refused by the trial court, reads as follows: "If you find in favor of the Plaintiff, and against the Defendant, was it based solely on the Rules of Professional Conduct."

¶ 83 With respect to the Rules of Professional Conduct, the jury was instructed as follows:

"There was in force in the State of Illinois at the time of the occurrence in question a certain Supreme Court Rule of Professional Conduct which provided that, a lawyer shall abide by a client's decisions concerning the objectives of representation and shall consult with the client as to the means by which they are to be pursued.

If you decide that the defendants violated the Supreme Court Rule of Professional Conduct on the occasion in question, you may consider that fact together with all of the other facts to what extent, if any, defendants were professionally negligent before and at the time of the occurrence.

There was in force in the State of Illinois at the time of the occurrence in question a certain Supreme Court Rule of Professional Conduct which provided that, a lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

If you decide that the defendants violated the Supreme Court Rule of Professional Conduct on the occasion in question, you may consider that fact together with all of the other facts to what extent, if any, defendants were professionally negligent before and at the time of the occurrence."

After deliberating, the jury returned general verdict form A, which states: "We, the jury, find for Adriana Brannen, and Standard Bank and Trust, under Trust No. 3265, and against Joerg Seifert, Joerg Seifert Ltd. P.C., and Joerg Seifert Law Officers, P.C."

- 18 -

¶ 84    We do not discern the ultimate issue of fact to which this question relates. This is a professional negligence case, not a proceeding to determine "solely" whether defendants violated a rule of professional conduct. As such, the jury was instructed that, in order to find in favor of plaintiffs, it must find by a preponderance of the evidence that defendants owed plaintiffs a duty, breached that duty, the breach of duty proximately caused plaintiffs injury, plaintiffs incurred damages and, finally, it had to find the LeFevours were solvent. Thus, the special interrogatory was not in proper form because an affirmative or negative answer to this special interrogatory would not test the general verdict. According to the expert testimony, a breach of either rule, or both, would be a breach of the standard of care sufficient to satisfy the proof necessary to find in favor of plaintiffs on that element of claim and, therefore, the special interrogatory would be consistent with the general verdict. *Thomas v. Johnson Controls, Inc.*, 344 Ill. App. 3d 1026, 1033 (2003).

¶ 85    The proposed interrogatory is not dispositive of an ultimate issue of fact such that it would independently control the verdict. See *Snyder v. Curran Township*, 281 Ill. App. 3d 56, 59-61 (1996). Whether defendants violated the Rules of Professional Conduct was not an ultimate issue in this case. The ultimate issues in this case involved the elements of duty, breach of duty, proximately caused damages and solvency. Proximate cause, damages and solvency are questions of fact that are not contemplated by the special interrogatory. While an affirmative answer to the special interrogatory may be helpful to understand the reasoning behind the jury's verdict, it would not be inconsistent with this verdict. Instead, the special interrogatory would only serve to bolster defendants failed theory that a violation of professional rules cannot form the basis of an independent cause of action, a theory that is not applicable in this professional negligence case. The trial court correctly denied the special interrogatory and defendants' attempt to reframe the nature of this case.

¶ 86    A special interrogatory is proper when it consists of a single, direct question that is dispositive of an issue in the case such that it would, independently, control the verdict. *Northern Trust Co. v. University of Chicago Hospitals & Clinics*, 355 Ill. App. 3d 230, 251 (2004). A special interrogatory may focus on only one element of a claim, but only if that element is dispositive of the claim at issue. Where there are two alternate theories of negligence and the special interrogatory does not differentiate between the two, the special interrogatory is not in proper form. *Id*.

¶ 87    Here, there was testimony concerning other acts and omissions of defendants that could support a finding of professional negligence, for example, selection of the wrong remedy, which was outside the scope of the special interrogatory, making it not in proper form. In addition, the facts surrounding the conduct of the parties in the course of defendants' representation were disputed and the jury was instructed to consider all the evidence, including expert testimony dealing with the standard of care. The proposed interrogatory did not delineate between the two distinct rules and therefore an answer to this interrogatory would not have been irreconcilable with the general verdict.

¶ 88    After a review of all the instructions in the context of the facts and issues presented to the jury, we find the proposed special interrogatory was not in proper form and would not have challenged the general verdict in favor of the plaintiffs. Plaintiffs pursued a proper, viable legal

negligence lawsuit not dependent solely on a breach of professional rules. Accordingly, we find the trial court correctly refused the special interrogatory.

¶ 89                                                    Setoff

¶ 90    Defendants contend that the trial court erred in denying their posttrial motion for a setoff of the jury award based on repairs to the property made by the LeFevours, totaling $15,000 to $20,000, and other itemized payments made to plaintiffs by the LeFevours.

¶ 91    Plaintiffs argue that defendants have waived this issue and should be barred from raising a setoff claim because defendants failed to preserve the issue with an objection at trial.

¶ 92    The Illinois Supreme Court has established two distinct meanings for the term "setoff." *Thornton v. Garcini*, 237 Ill. 2d 100, 113 (2009). First, a setoff may refer to a situation when a defendant has a distinct cause of action against the same plaintiff who filed suit against him, which must be raised in the pleadings. *Id*. Second, a setoff may refer to a defendant's request for a reduction of the damage award because a third party has already compensated the plaintiff for the same loss. *Id*.

¶ 93    In this case, defendants are referring to the second category of setoff. A defendant's request for setoff to reflect amounts paid by a third party seeks not to modify, but rather to satisfy the judgment entered by the trial court. *Star Charters v. Figueroa*, 192 Ill. 2d 47, 48 (2000). Such a request does not arise as a result of trial, but is instead in the nature of a supplementary or enforcement proceeding and is not a motion directed against the judgment. *Id*. Therefore, it is an issue that need not be raised at trial or in a posttrial motion. *Id*. Consequently, the fact that defendants did not object at trial does not prevent us from addressing the issue here.

¶ 94    Defendants seek a setoff of the jury award for two separate categories of payments made by the LeFevours: (1) the amount the LeFevours paid to improve and/or repair the property, estimated to be between $15,000 and $20,000; and (2) the $34,096 actually paid by the LeFevours pursuant to the contract. Plaintiffs disagree and contend that defendants' setoff claims are too speculative and are merely attempts to chip away at a unanimous jury award.

¶ 95    The right to a setoff is derived from either a contractual right or equity. *Fisher v. State Bank of Annawan*, 163 Ill. 2d 177, 181 (1994). Without having a contractual right, there is no inherent right to setoff in equity; rather, equitable setoff was conceived as a limited remedy. *Bank of Chicago-Garfield Ridge v. Park National Bank*, 237 Ill. App. 3d 1085, 1091 (1992). To give rise to a right of setoff in equity, the indebtedness must be certain and already reduced to a precise figure without a need for the intervention of a court or jury to estimate it. *Faber, Coe & Gregg, Inc. v. First National Bank of Chicago*, 107 Ill. App. 2d 204, 209 (1969).

¶ 96    We find that the defendants are not entitled to a setoff of the jury award in the amount of the expenditures made by the LeFevours in improving and/or repairing the property because the amount claimed is an estimate and not a precise figure. Even if the amount expended by the LeFevours were a precise amount, such an amount would be an improper setoff against this judgment absent contractual language allowing otherwise. The correct manner of ascertaining the benefit of these alleged improvements is not by a calculation of the amount spent by the LeFevours, but the amount these improvements increased the value of the property, if any. No

such evidence has been submitted and due to the passage of time since the transfer of possession of the property, any attempt to calculate an increase in value of the property, if any, would be speculative. Further, the claimed damages were for specific contractual damages that did not relate to property improvements: principal and interest installment payments, insurance, real estate taxes and attorney fees. Furthermore, defendants' expert testified that plaintiffs were entitled to keep the improvements made by the LeFevours. Therefore, because these expenditures do not relate to the same loss claimed by the plaintiffs, we find there is no basis to apply a setoff to the jury award for improvements made. *Thornton v. Garcini*, 237 Ill. 2d 100, 113 (2010).

¶ 97 We similarly reject defendants' contention that the $34,096 the LeFevours actually paid pursuant to the agreement entitles them to have such amount set off from the damage award because a review of the record reasonably shows these payments were essentially accounted for in plaintiffs' requested damages.

¶ 98 Defendants argue, and the record shows, evidence of the specific payments made to plaintiffs by the LeFevours amounting to $34,196. Our review of the record shows these payments were credited against the amount due under the contract. Pursuant to the agreement, the total principal payment the LeFevours were obligated to pay was $102,750. John Brannen testified that he received an initial payment of $12,500. This would reduce the principal balance due to $90,250. Brannen testified that the total interest due was $73,203 and he credited the LeFevours with paying $19,350. This would reduce the interest balance due to $53,853. Therefore, after these credits, the principle and interest due was $144,103, the same amount requested of the jury by plaintiff in closing argument.

¶ 99 Further, Brannen credited the property tax amount due by $2,333.17 paid by the LeFevours, leaving a balance of $13,342.90. He further reduced the amount due for homeowners' insurance by $1,272,[3] leaving an unpaid balance of $2,594. Brannen's testimony clearly showed he credited the LeFevours with making total payments in the amount of $35,455.17, or $1,359.17 *more* than the $34,096 defendants claim as a setoff. Defendants have not shown they are entitled to a setoff.

¶ 100 Accordingly, we affirm the trial court's denial of defendants' posttrial motion seeking a setoff of the jury award based on value of the repairs made by the LeFevours or for actual payments made to plaintiffs by the LeFevours.

¶ 101                                    Judgment Notwithstanding the Verdict

¶ 102 Defendants' last argument is that the trial court erred in denying their motion for judgment notwithstanding the verdict because the evidence did not support the verdict. Specifically, the defendants contend that the trial court should have entered judgment in favor of the defendants

[3]The record shows a payment of $1,272 made to plaintiffs on June 6, 2006. According to Brannen, all payments made were applied to reduce the total interest owed. However, we note that payment was the same amount that Brannen testified the LeFevours paid toward their homeowners' insurance premium. Nevertheless, the payment of $1,272 was clearly included in calculating the total payments, $19,350, made by the LeFevours during the time they occupied the residence.

- 21 -

because the jury did not itemize any of the individual costs and/or damages awarded, but simply returned a lump sum award of $199,500. Second, the defendants again argue the sufficiency of the evidence relating to the solvency of the LeFevours.

¶ 103    A motion for judgment notwithstanding the verdict raises a question of law and asserts that even when all of the evidence is considered in the light most favorable to the party opposing the motion, there is a total failure or lack of evidence to prove a necessary element of the opposing party's case. In determining whether defendants are entitled to judgment notwithstanding the verdict, the question is whether all of the evidence, when viewed most favorably to plaintiffs, so overwhelmingly favors the movant that a contrary verdict could never stand. *Santos v. Chicago Transit Authority*, 198 Ill. App. 3d 866, 868 (1990). When a jury returns a verdict that is not supported by the evidence, it is the duty of the trial court and appellate court to act as a check on the jury and reject the verdict. *Joseph v. Schwartz*, 96 Ill. App. 3d 749, 755 (1981). However, a court is to substitute its judgment for that of the jury only in cases where failure to do so would result in great injustice. *Tozzi v. Testa*, 97 Ill. App. 3d 832, 835 (1981). A trial court's ruling on a motion for judgment notwithstanding the verdict is subject to a *de novo* standard of review on appeal. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 37.

¶ 104    Defendants take issue with the verdict form filled out by the jury because the jury did not itemize the individual damages. The jury was clear on the verdict form that it was awarding plaintiffs the total damages sought. While a verdict is ordinarily final so far as the jury which rendered it is concerned, it may be modified by a judge through remittiturs or additurs. *In re Marriage of Davies*, 95 Ill. 2d 474, 479 (1983).

¶ 105    Here, the jury was instructed that if it found in favor of the plaintiffs it was to complete jury verdict form A for the purpose of calculating the damages awarded. Verdict form A provided four subcategories to itemize the damages awarded by the jury: (1) unpaid installments and interest on the installment sales contract; (2) insurance costs incurred; (3) taxes incurred; and (4) legal and court expenses incurred and paid to Shaw & Guissis, Attorney Raab's law firm. Defendants' issue is that instead of itemizing the damages on verdict form A, the jury only filled out the sum of total damages section of the form by inserting a numerical amount of $199,500. Though the jury did not itemize each category of the award, it is clear from the form that the jury was awarding plaintiffs the total amount sought on each category. The jury twice wrote in parentheses next to the $199,500 award the statement "total damages sought" by the plaintiffs. In plaintiffs' closing argument, counsel requested total damages of $199,500 and itemized them as follows:

| | |
|---|---|
| Unpaid installments and interest | |
| Owed on the Installment Sales Contract: | $144,103 |
| Insurance costs Incurred: | $2,594 |
| Taxes Incurred: | $13,342.90 |
| Legal and Court expenses Incurred: | $39,435.44 |
| | $199,475.34 (total amount) |

¶ 106    The jury award to the plaintiffs was $199,500 or $24.66 in excess of the itemized actual damages. Therefore, we exercise our authority under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) and reduce the damages awarded to plaintiffs by $24.66, in order to equal the "total damages sought" and the actual damages lost by plaintiffs, as intended by the jury.

¶ 107    Next, the defendants reassert that, as a matter of law, the plaintiffs failed to prove all the elements of a legal malpractice cause of action by failing to plead and prove that the LeFevours would have been solvent defendants in the underlying claim. *Sheppard v. Krol,* 218 Ill. App. 3d 254, 259 (1991). A posttrial motion for judgment notwithstanding the verdict is appropriate to challenge the plaintiffs' failure to prove an element of his case. *Kennan v. Checker Taxi Co.*, 250 Ill. App. 3d 155, 160 (1993). As they did in their directed verdict argument, defendants are again contending that the record fails to establish the solvency of the underlying defendant because the LeFevours were seriously considering filing bankruptcy had a judgment for the arrearage been entered against them. *Sheppard*, 218 Ill. App. 3d at 259.

¶ 108    As previously discussed, we find that there is sufficient evidence in the record to support the jury finding that the LeFevours were solvent because a judgment against them could have been collected either in whole or in part, but for defendant's legal malpractice. In this case, the testimony concerning the financial condition of Mr. LeFevour was thoroughly discussed and the jury had more than sufficient evidence to make a determination of solvency such that the jury verdict will not be set aside.

¶ 109    The question of the LeFevours' solvency was a question of fact, which the jury was asked to resolve. We note that defendants state in a footnote that they objected to the court's instruction defining solvency but do not further argue the point or present authority on the issue. Therefore, they have forfeited their argument.

¶ 110    Evidence was introduced at trial by both parties on this issue. The record shows evidence to support the LeFevours' solvency through: (1) the plaintiffs' expert witness's testimony about Mr. LeFevour's high earning potential as a lawyer; (2) Mr. LeFevour's testimony of being able to satisfy his significant tax debts with a payment plan; and (3) the fact that the LeFevours did not resort to filing for bankruptcy protection. We reject the defendants' contention that because the record shows testimony by Mr. LeFevour and his attorney that bankruptcy was being "strongly considered" if a judgment was entered against him, the jury improperly resolved this issue of fact in favor of the plaintiffs, as a matter of law. The fact that bankruptcy may have been a real possibility for the LeFevours is not, alone, enough to nullify this verdict. Bankruptcy is a possibility for many people facing an adverse judgment but it does not follow conclusively that it will occur. It is relatively easy to state, in hindsight, that one would not or could not pay all or part of a judgment. That is pure conjecture. It is quite different to make a determination, based on sworn testimony concerning the facts existing at the time in question, that the underlying defendant could withstand all or part of a judgment. This is a classic function of a jury to weigh the evidence and judge the credibility of the witnesses on the issue of solvency. We cannot say this jury unreasonably concluded plaintiffs proved each element of a legal negligence claim. Based on the record, the jury reasonably could have determined that the LeFevours were solvent at the relevant time.

¶ 111      Therefore, we find that the trial court properly denied defendants posttrial motion for judgment notwithstanding the verdict, but reduce the award by $24.66 to represent the actual amount of damages sustained by the plaintiffs.

¶ 112                                 CONCLUSION

¶ 113      Based on the foregoing, the judgment of the circuit court is affirmed as modified.

¶ 114      Affirmed as modified.